UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

United States of America,

        Plaintiff,

   vs.                        REPORT AND RECOMMENDATION

Roland Gene Roy,

        Defendants.           Crim. No. 04-477(02)(MJD/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

I.  Introduction

    This matter came before the undersigned United States Magistrate Judge

pursuant to a general assignment, made in accordance with the provisions of Title 28

U.S.C. §636(b)(1)(B), upon the following Motions of the Defendant Roland Gene Roy

("Roy"):

                1.    Roy's Motion to Suppress Statements, Admissions,
            and Answers.

                2.    Roy's Motion to Suppress Evidence Obtained as a
            Result of Search and Seizure.

A Hearing on the Motions was conducted on February 9, 2005, at which time, Roy

appeared personally, and by Scott F. Tilsen, Assistant Federal Defender, and the

Government appeared by David M. Genrich, Assistant United States Attorney.  For reasons which follow, we recommend that Roy's Motion to Suppress Statements, Admissions and Answers be denied, and that his Motion to Suppress Evidence Obtained as a Result of Search and Seizure be denied as well.

## II.  Factual Background

Roy is charged with two Counts of being a Felon in Possession, in violation of Title 18 U.S.C. §§922(g)(1), and 924(a)(2).  The alleged violations are said to have occurred on or about November 7, 2004, in this State and District.  As pertinent to those charges, and to the Motions pending before us, the operative facts may be briefly summarized.[1]

Tyson Nelson ("Nelson"), who has been employed as a Conservation Officer for three and one-half (3½) years, with the Red Lake Band of Chippewa Indians, testified at the Hearing.  Nelson's duties include the enforcement of laws, and Tribal

---

[1]Rule 12(e), Federal Rules of Criminal Procedure, provides that "[w]here factual issues are involved in determining a motion, the court shall state its essential findings on the record."  As augmented by our recitation of factual findings in our "Discussion," the essential factual findings, that are required by the Recommendations we make, are contained in this segment of our Opinion.  Of course, these factual findings are preliminary in nature, are confined solely to the Motions before the Court, and are subject to such future modification as the subsequent devel-opment of the facts and law may require.  See, United States v. Moore, 936 F.2d 287, 288-89 (6th Cir. 1991); United States v. Prieto-Villa, 910 F.2d 601, 610 (9th Cir. 1990).

regulations, such as the Tribal gaming laws, which prohibit non-members from hunting on Tribal lands, and his jurisdiction extends over the boundaries of the Red Lake Indian Reservation. He has received federally certified training, in New Mexico, which was sponsored by the Bureau of Indian Affairs ("BIA"), and he is certified as a Federal Officer for purposes of Tribal jurisdiction.[2]

On November 7, 2004, at approximately 2:00 o'clock p.m., Nelson was on duty, and he received a call from Police Dispatch, informing him that there might be illegal hunters on Highway 89, by the South Boundary Road. Nelson testified that it was not an unusual type of call, and that it was within his responsibilities to investigate such a report.

Nelson drove down Highway 89, to South Boundary Road, in a vehicle which was equipped with police lights, and a siren. Although Nelson, who was in full uniform, was alone in his vehicle, three other Officers also responded -- namely Officers Barron [phonetic], Summer [phonetic] and Cloud. While one, or more, of the Officers traveled west, Nelson proceeded eastbound on South Boundary Road, which he described as a logging road trail that has one lane in each direction. At the

_____

[2]On cross-examination, Nelson produced his credentials -- namely, one form of identification from the Tribe, and one from the BIA. Nelson testified that he was not employed by the BIA, even though he received his certification from that Agency.

intersection of South Boundary Road, and Barton's Trail, or approximately one hundred fifty (150) yards down the road, Nelson observed a truck driving slowly, which caused him to think that they might be hunting.  Nelson pulled his vehicle next to the driver's side of the truck, without activating his lights, or his siren, at which point in time, the truck stopped.

Nelson remained in his vehicle, which was facing in the opposite direction of the truck, and asked the individuals some questions, to see if they were hunting, and if they were members of the Tribe.  He initially talked to the driver, who he did not recognize, and then to the passenger, who he identified as Harry Hanson ("Hanson") -- the co-Defendant -- and who he recognized as a Tribal member.  Nelson asked the driver his name, to which he responded that Nelson knew who he was, because he lived next to Dorothy, who is Nelson's aunt.  Thereafter, the driver, who Nelson identified as the Defendant, said that his name was Roland Roy, Sr.  Nelson also asked Roy, who appeared to be Native American, if he was a Tribal member, because only Tribal members are allowed to hunt on Reservation land, and Roy responded that he was.  After observing a muzzle loader, which was alternatively identified as a black powder rifle, on the dashboard, Nelson inquired about it, and the individuals said that

they were just hunting.   Nelson testified that there was no question that both individuals were entitled to hunt, and he did not search the vehicle at that time.

Nelson was unaware of any violation of the law, during that stop, and he allowed them to leave, but he then checked his list of Tribal Warrants, and Hanson's name appeared.   Nelson called Dispatch, who confirmed that there was an active Tribal Arrest Warrant for Hanson, and Nelson caught up to Roy's truck.   Roy stopped his vehicle, and Nelson then activated his lights, and turned on his mountable camera, which records video feed of any actions that occur in front of his vehicle, but the audio was inoperable.[3]   Nelson radioed to Dispatch, to notify them that he would be out of his vehicle, during which time, both Hanson and Roy exited their vehicle, and approached Nelson's vehicle, while he was still inside of it.   Several times, Nelson instructed Roy and Hanson to return to their vehicle, and Roy complied, but Hanson did not.   When Nelson informed Hanson of the outstanding Warrant, and told Hanson that he had to accompany him, Hanson attempted to talk his way out of the situation,

---

[3]The surveillance video, from Nelson's vehicle, was received into evidence, solely for the purposes of this Hearing, without objection.   See, Government Exh. 1. We have reviewed the videotape, and we find it to be substantially consistent with Nelson's testimony.

by imploring Nelson to say that he had not seen him.[4]  At some point during this second encounter, another vehicle, which belonged to Darrell [phonetic] King ("King") pulled up on the other side of the road, from where Roy was sitting in the driver's seat, and parked, and although Nelson could not say for certain whether Roy, and the driver of the King vehicle, were talking, he did not observe, or participate in any conversations with the driver, and the driver did not interfere.[5]

Hanson then asked if he could get his cigarettes, which Nelson allowed him to do in order to avoid a combative situation,[6] and Hanson approached Roy's truck on the passenger side, while Nelson approached the driver's side of the vehicle, at which time, he observed the butts of two rifles, which were partially covered up by a jacket, and which were situated between the driver's, and passenger's side of the vehicle, with the barrels facing toward the front floorboard.[7]  There was also a rifle case in the

_____

[4]According to Nelson, Hanson never said that the Warrant was a mistake and, in any event, Dispatch had confirmed its existence.

[5]Nelson testified that the window on King's vehicle was down, until he maced Hanson.

[6]Hanson was described as being sixty (60), while Nelson is thirty-one (31) years of age.

[7]Nelson testified that he did not see the guns during his first interaction with Roy and Hanson, but he observed them, on the second occasion, through the truck's (continued...)

- 6 -

truck.   Knowing that Hanson was a felon, who was prohibited from possessing firearms, Nelson asked Roy to hand him the black powder rifle, which he placed on the hood of the vehicle, and Nelson then asked for the other two rifles, to which Roy responded by asking "what rifles?"  Hanson came around to the driver's side of the vehicle, and stood next to Nelson.  After Nelson repeated his request for the rifles, Hanson attempted to hit him, so Nelson backed up to a safer distance.  Then, Hanson asked Roy to hand him a gun, and although Roy did not say anything, it appeared as though he was going to do so,[8] which caused Nelson to draw his weapon, and to instruct Roy to put down the gun.  Roy put up his hands, but Hanson came toward Nelson, who sprayed him with mace, and performed a common peroneal hit, which entailed striking a blow to Hanson's thigh, but it had no effect, so Nelson maced

---

[7](...continued)
back window.  He testified that his observation raised some concern for his personal safety, because Hanson was approaching the passenger side of the vehicle, and Roy was still in the truck.  At the Hearing, Nelson drew a diagram of the vehicle, and the guns, which was designated as Defendant's Exhibit 1, and which was received into evidence, without objection.

[8]During cross-examination, Nelson stated that he did not see Roy attempt to hand him -- namely, Nelson -- the gun, and that Roy did not give the rifle to Hanson, because Nelson did not give him the opportunity to do so.  However, he did observe Roy moving around in the cab of the vehicle, and he thought that Roy was about to give Hanson the weapon.  Nelson testified that, at that point in time, there was no reason to arrest Roy.

Hanson a second time.  During that encounter, Nelson kept his gun trained on Hanson.

After Hanson ran a short distance from the vehicle, Nelson holstered his weapon, opened the driver's side door of Roy's vehicle, and again instructed Roy to give him the guns.  Roy handed one of the guns to Nelson, which meant that there was one gun remaining in the vehicle, and Nelson placed the gun handed to him on the top of the roof.  Based on his observations, Nelson identified that gun as an SKS rifle, and he stated that, as he was grabbing it, the clip fell out, and he noticed ammunition.  As he handed the gun to Nelson, Roy stated that he did not want to go to Jail, and that he did not want anything to do with "this," which Nelson interpreted to mean the entire incident.  Nelson instructed Roy to get out of the vehicle, because he was going to arrest him for aiding and abetting Hanson's escape, by attempting to hand the gun to Hanson.  Instead, Roy started his vehicle, and drove away.  Hanson jumped onto the back of Roy's truck, and Nelson pursued them to Round Lake Road.  Although the gun, which had been placed on the hood of the truck, fell off a couple of hundred yards down the road, Hanson grabbed the rifle from the roof of the truck.  Officer Cloud arrived as Roy and Hanson were fleeing, and he also gave pursuit. Subsequently, the officers located the truck, but Roy and Hanson had fled on foot.

The black powder rifle, which had been in plain view on the dashboard, and the third rifle, which had remained in the truck, were recovered, but the SKS rifle was not. Officer Summer later gave Nelson the gun from the truck, which was zipped up in a case, and Nelson was unaware of whether any fingerprint testing had been conducted on the weapons.

### III.  Discussion

Roy argues that, following Nelson's first encounter with Hanson and himself, there was no reason to detain him, or to make the seizure of the weapons.  Further, during the second encounter, Nelson had Hanson out of the truck, but permitted him to return.  Therefore, Roy contends that we can conclude that the officer safety exception does not apply, and that there was no reason to arrest him.  Roy also questions whether Nelson was lawfully in a position to view the butts of the rifles, and he argues that there was no lawful reason to seize them.  Finally, Roy maintains that Nelson lacked probable cause to detain him, and that he was privileged to leave the scene, out of self-defense, in light of the encounter between Nelson and Hanson.

At the Hearing, the Defendant stated that the sole basis for his Motion to Suppress Statements, Admissions, and Answers, was as a product of the alleged violation of his Fourth Amendment right against unreasonable search and seizure, and

that he was not raising any Fifth Amendment, or <u>Miranda</u> issues.  See, <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966).  Accordingly, we begin our analysis with a discussion of Roy's Motion to Suppress Evidence Obtained as a Result of Search and Seizure.

        A.     <u>Roy's Motion to Suppress Evidence Obtained as a Result of Search and Seizure</u>.

           1.     <u>Officer Nelson's Stops of Roy's Vehicle</u>.

              a.     <u>Standard of Review</u>.  "Reasonable suspicion requires '"a particularized and objective basis" for suspecting the person stopped of criminal activity,'" and is not as demanding a standard as that of "probable cause."'" <u>Thomas v. Dickel</u>, 213 F.3d 1023, 1025 (8th Cir. 2000), quoting <u>Ornelas v. United States</u>, 517 U.S. 690, 696 (1996), quoting, in turn, <u>United States v. Cortez</u>, 449 U.S. 411, 417 (1981).  Notably, "[a] reasonable suspicion may be justified even if there are innocent explanations for a defendant's behavior when the circumstances are considered in the totality." <u>United States v. Tuley</u>, 161 F.3d 513, 515 (8th Cir. 1998), citing <u>United States v. Bloomfield</u>, 40 F.3d 910, 918 (8th Cir. 1994)[en banc], cert. denied, 514 U.S. 1113 (1995).  Further, a <u>Terry</u> stop is an investigative stop, which permits "an officer with reasonable suspicion to detain an individual to ask 'a moderate number of

- 10 -

questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions.'" United States v. Rodriguez-Arreola, 270 F.3d 611, 616 (8th Cir. 2001), quoting Berkemer v. McCarty, 468 U.S. 420, 439 (1984).

        b.    Legal Analysis. As an initial matter, Roy does not argue that the first stop of his vehicle was improper.  Moreover, Nelson received a report that there might be illegal hunters on Highway 89, by the South Boundary Road.  Upon investigating that report, Nelson observed Roy's vehicle, on South Boundary Road, traveling at a slow rate of speed, and at a relatively short distance from the intersection of Highway 89 and South Boundary Road, which led him to suspect that the occupants might be hunting.  Based on that information, Nelson stopped the vehicle.  Accordingly, we find that the stop was fully supported by reasonable suspicion that the occupants were engaged in criminal activity.

Following his stop of the vehicle, Nelson recognized Hanson, but not Roy, and reasonably asked a limited number of questions to ascertain his identity, and to determine whether he was entitled to be hunting.  At that time, Nelson also observed the black powder rifle on the dashboard of the vehicle.  Since he had satisfied himself that the individuals were allowed to hunt on Tribal lands, he did not search the vehicle, and he allowed Roy and Hanson to proceed on their way.  However, after

- 11 -

learning that Hanson had an outstanding Tribal Arrest Warrant, Nelson again stopped the vehicle, in order to arrest Hanson.

We note that Roy does not have "standing"[9] to challenge Hanson's arrest. See, Rakas v. Illinois, 439 U.S. 128, 133-34 (1978)("Fourth Amendment rights are personal [and] may not be vicariously asserted."); Minnesota v. Carter, 525 U.S. 83, 88 (1998)("[I]n order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable; i.e., one that has 'a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'")[citations

─────────────

[9]We follow our Court of Appeals' approach, as explained in United States v. Green, 275 F.3d 694, 698 n. 3 (8th Cir. 2001):

> We use the term "standing" as a shorthand reference to the issue of whether the defendants' Fourth Amendment interests were implicated by the challenged government actions. "Technically, the concept of 'standing' has not had a place in Fourth Amendment jurisprudence * * * since the Supreme Court in Rakas v. Illinios, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 386 (1978), indicated that matters of standing in the context of searches and seizures actually involved substantive Fourth Amendment law." United States v. Sanchez, 943 F.2d 110, 113 n. 1 (1st Cir. 1991).

- 12 -

omitted].   Nevertheless, we consider Hanson's arrest, because it was the basis for the

subsequent stop of Roy's vehicle.

Here, it is undisputed that Hanson's arrest was pursuant to an outstanding

Warrant, although the Warrant was not, at that time in Nelson's possession. Although

we have no reason to conclude that the Warrant had to be in Nelson's possession, even

if we considered that a constitutional defect, that fact alone, would not render the

arrest unlawful.   When a police officer has probable cause to believe that a person has

committed a felony, a warrantless arrest is permitted.   United States v. Travis, 993

F.2d 1316, 1323 (8th Cir. 1993), citing United States v. Watson, 423 U.S. 411 (1976).

"Determining probable cause to arrest requires the court to focus on the moment

the arrest was made and to ask whether 'the facts and circumstances within [the

officers'] knowledge and of which they had reasonably trustworthy information were

sufficient to warrant a prudent man in believing that the [suspect] had committed or

was committing an offense.'"   United States v. Taylor, 106 F.3d 801, 803 (8th Cir.

1997), quoting Beck v. Ohio, 379 U.S. 89, 91 (1964); see also, Kiser v. Huron, 219

F.3d 814, 816 (8th Cir. 2000)("Furthermore, '[a]n officer has probable cause to make

a warrantless arrest when facts known to the officer are sufficient to make a

reasonably prudent officer believe that the suspect is committing or has committed an

- 13 -

offense.'"), quoting <u>Olinger v. Larson</u>, 134 F.3d 1362, 1366 (8th Cir. 1998); <u>Tokar v. Bowersox</u>, 198 F.3d 1039, 1046-47 (8th Cir. 1999)("The existence of probable cause in fact to make a warrantless arrest depends upon whether, at the moment the arrest was made, the facts and circumstances within the arresting officers' knowledge, and of which they had reasonably trustworthy information, were sufficient to warrant a prudent person to believe that the suspect had committed or was committing an offense."). "'The determination of whether probable cause exists must not rest on isolated facts; rather it depends on the cumulative effect of the facts in the totality of circumstances.'"   <u>Tokar v. Bowersox</u>, supra at 1047, quoting <u>United States v. Everroad</u>, 704 F.2d 403, 406 (8th Cir. 1983).   We keep in mind, however, that "[p]robable cause does not require a prima facie showing of criminal activity, but only the probability of criminal activity."   <u>Id.</u>

At the time that he effected the second stop of Roy's vehicle, Nelson was aware that there was an outstanding Arrest Warrant for Hanson.   He also knew that Hanson was a person, who was prohibited from possessing firearms and, having seen the black powder rifle on the dashboard of the vehicle, Nelson had probable cause to believe that Hanson had committed the offense of being a felon in possession.   Either piece of information established probable cause to arrest Hanson, and accordingly, Nelson

- 14 -

was entitled to stop the vehicle, in which Hanson, and Roy, were traveling.  We

understand Roy to argue that Nelson had no reason to continue to detain him.  Rather,

Roy contends that Nelson should have effected, and completed, the arrest of Hanson,

without allowing him to return to the vehicle, in which case, Roy would have been

free to leave.  However, even if Hanson had not been permitted to return to the

vehicle, we find that Nelson could have continued the detention of the vehicle, in

order to search it, and to seize the weapon he saw in plain view, and we address that

issue, in further detail.

> 2.     Officer Nelson's Seizure of the Firearms, and Arrest of Roy.

> a.     Standard of Review.  A search incident to a valid arrest is

constitutional.  See, e.g., New York v. Belton, 453 U.S. 454, 461 (1981); Chimel v.

California, 395 U.S. 752, 762 (1969); United States v. Klein, 13 F.3d 1182, 1184 (8th

Cir. 1994), cert. denied, 512 U.S. 1226 (1994).  "A custodial arrest of a suspect based

on probable cause is a reasonable intrusion under the Fourth Amendment; that

intrusion being lawful, a search incident to the arrest requires no additional

justification."  Id., quoting United States v. Robinson, 414 U.S. 218, 235 (1973); see

also, Curd v. City Court of Judsonia, Ark., 141 F.3d 839, 842 (8th Cir.

1998)("Warrantless searches incident to a custodial arrest are 'justified by the

reasonableness of searching for weapons, instruments of escape, and evidence of

crime when a person is taken into official custody and lawfully detained.'"), quoting

United States v. Edwards, 415 U.S. 800, 802-03 (1974).

The Supreme Court, in New York v. Belton, supra at 460-61, stated, as follows:

> [W]e hold that when a policeman has made a lawful
> custodial arrest of the occupant of an automobile, he may,
> as a contemporaneous incident of that arrest, search the
> passenger compartment of that automobile. It follows from
> this conclusion that the police may also examine the
> contents of any containers found within the passenger
> compartment, for if the passenger compartment is within
> reach of the arrestee, so also will containers in it be within
> his reach. Such a container may, of course, be searched
> whether it is open or closed.

Id. (footnotes and citations omitted).

Furthermore, in the context of automobiles, our Court of Appeals has recently

reiterated:

> As long as law enforcement officials have probable cause,
> they may search an automobile without a warrant under the
> automobile exception. See Pennsylvania v. Labron, [518
> U.S. 938, 940] (1996); [United States v.] Martinez, 78 F.3d
> [399] at 401 [(8th Cir. 1996)]. Probable cause exists when,
> given the totality of the circumstances, a reasonable person

could believe there is a fair probability that contraband or
evidence of a crime would be found in a particular place.
See Illinois v. Gates, [462 U.S. 213, 238] (1983).

United States v. Fladten, 230 F.3d 1083, 1085 (8th Cir. 2000).

The "plain view" doctrine is a recognized exception to the general Warrant

requirement, and permits the lawful seizure of incriminating evidence that is in the

"plain view" of the searching officers.  As explained in United States v. Murphy, 69

F.3d 237, 241-42 (8th Cir. 1995), cert. denied, 516 U.S. 1153 (1996):

> The plain view doctrine allows police officers to seize
> evidence without a warrant when (1) "the officer did not
> violate the Fourth Amendment in arriving at the place from
> which the evidence could be plainly viewed," (2) the ob-
> ject's incriminating character is immediately apparent, and
> (3) the officer has "a lawful right of access to the object
> itself."  United States v. Hughes, 940 F.2d 1125, 1126-27
> (8th Cir. [1991])(quoting Horton v. California, [496 U.S.
> 128, 136-37] (1990)), cert. denied, [502 U.S. 896] (1991).

"The 'immediately apparent' requirement means that officers must have 'probable

cause to associate the property with criminal activity.'"  United States v. Hatten, 68

F.3d 257, 261 (8th Cir. 1995), cert. denied, 516 U.S. 1150 (1996), quoting United

States v. Garner, 907 F.2d 60, 62 (8th Cir. 1990), cert. denied, 498 U.S. 1068 (1991).

Of course, "[p]robable cause demands not that an officer be 'sure' or 'certain' but only

that the facts available to a reasonably cautious man would warrant a belief 'that

certain items may be contraband or stolen property or useful as evidence of a crime.'" Id.

        b.    <u>Legal Analysis</u>.  Here, although Hanson had exited the vehicle at the time of his arrest, he was still considered to be an occupant of the van. See, <u>United States v. Snook</u>, 88 F.3d 605, 608 (8th Cir. 1996)("The fact that Snook had just stepped out of his vehicle as the officer arrived and before his arrest does not alter his status as an 'occupant' of the vehicle."); <u>United States v. Riedesel</u>, 987 F.2d 1383, 1388-89 (8th Cir. 1993)(holding that, where the individual had driven away from the initial encounter, and was arrested as he was walking from a gas station toward his car, a search of the vehicle incident to arrest was valid).   Therefore, Nelson was entitled to search the vehicle, in which Roy remained, incident to Hanson's arrest. The same conclusion would be equally applicable, even if Nelson had already arrested Hanson, and placed him in his vehicle for transport.  See, <u>United States v. McCrady</u>, 774 F.2d 868, 871-72 (8th Cir. 1985)(the search of the passenger compartment of the defendant's car, subsequent to his arrest and placement in the police car, was valid as incident to his arrest).

        Furthermore, Nelson was aware that Hanson was a person, who was prohibited from possessing firearms, and he had seen at least one firearm, in plain view, in Roy's

vehicle.  Since we have found that the initial stop of Roy's vehicle was proper, Nelson

had not violated the Fourth Amendment, when he saw the weapon in plain view, and

although it was unclear whose firearm it was, he had probable cause to believe that the

weapon was evidence of a crime.  Accordingly, the seizure of the firearm was

justified.

In effecting that seizure, Nelson observed, in plain view, two additional

firearms, which he was also entitled to seize.  During his attempts to secure the

firearms, Hanson assaulted him, and directed Roy to give him a gun, and it appeared

to Nelson that Roy was going to comply with Hanson's request.  Even after Hanson

ran a short distance away from the vehicle, Nelson continued to order Roy to hand

him the weapons.  Nelson's actions are justified, because he was still entitled to seize

the weapons as evidence of a crime, committed by Hanson, and he reasonably feared

for his safety.[10]  Furthermore, in light of Roy's perceived willingness to hand a gun

to Hanson, and to aid in his escape, there was probable cause to arrest Roy.

Accordingly, we find that Roy's Fourth Amendment rights were not violated, and we

---

[10]Roy urges us to conclude that Nelson could not have been concerned for his safety because, otherwise, he would not have allowed Hanson to return to a vehicle, in which weapons were present.  Even if Nelson did not apprehend possible danger at that time, the circumstances clearly changed following Hanson's assault, and his requests for Roy to hand him the gun, which he appeared to be willing to do.

recommend that his Motion to Suppress Evidence Obtained as a Result of Search and Seizure be denied.   Since Roy's Motion to Suppress Statements, Admissions, and Answers is predicated solely on an alleged Fourth Amendment violation, we similarly recommend that his Motion, in that respect, be denied as well.[11]

NOW, THEREFORE, It is --

RECOMMENDED:

1.    That the Defendant's Motion to Suppress Statements, Admissions, and Answers [Docket No. 33] be denied.

2.    That the Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 34] be denied.

Dated: March 11, 2005         s/Raymond L. Erickson
                              Raymond L. Erickson
                              UNITED STATES MAGISTRATE JUDGE

---

[11]We reject Roy's assertion that he was entitled to flee the scene, in self-defense.  Before he drove away, Roy stated that he did not want to go to Jail, and that he did not want anything to do with "this."  We find that Roy was motivated by those concerns, and not by a need to protect himself.

## NOTICE

Pursuant to Rule 45(a), Federal Rules of Criminal Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than March 28, 2005**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than March 28, 2005**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.