UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

United States of America,

        Plaintiff,

   vs.                   REPORT AND RECOMMENDATION

Roland Gene Roy,

        Defendants.        Crim. No. 04-477(02)(MJD/RLE)

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

I. <u>Introduction</u>

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the following Motions of the Defendant Roland Gene Roy ("Roy"):

      1.    Roy's Motion to Suppress Evidence Obtained as a Result of Search and Seizure.

      2.    Roy's Motion to Suppress Statements, Admissions, and Answers.

A Hearing on the Motions was conducted on April 26, 2005, at which time, Roy appeared personally, and by Scott F. Tilsen, Assistant Federal Defender, and the

Government appeared by David M. Genrich, Assistant United States Attorney.  For reasons which follow, we recommend that Roy's Motion to Suppress Evidence Obtained as a Result of Search and Seizure be denied, and that his Motion to Suppress Statements, Admissions and Answers be denied.[1]

## II.  Factual Background

As pertinent to the Motions presented, Roy is charged with one Count of being a Felon in Possession, in violation of Title 18 U.S.C. §§922(g)(1), and 924(a)(2).  The alleged violation is said to have occurred on or about August 2, 2004, in this State and District.[2]  As pertinent to those charges, and to the Motions pending before us, the operative facts may be briefly summarized.[3]

---

[1]At the close of the Hearing, the Government requested leave to submit additional documentation concerning some of the issues, which had been raised during the Hearing on the Motions.  Leave was granted, and the last submission on the issues was received on May 11, 2005, at which time, the Motions were taken under advisement.  See, Title 18 U.S.C. §3161(h) (1)(F) and (J); Henderson v. United States, 476 U.S. 321, 330-32 (1986); United States v. Blankenship, 67 F.3d 673, 767-77 (8th Cir. 1995).

[2]We note that Roy is charged with two additional Counts of being a Felon in Possession, which occurred on or about November 7, 2004, and which were the subject of an earlier Suppression Hearing.

[3]Rule 12(e), Federal Rules of Criminal Procedure, provides that "[w]here factual issues are involved in determining a motion, the court shall state its essential findings
(continued...)

Herbert May ("May"), who is a corporal with the Red Lake Police Department ("RLPD"), testified at the Hearing on the Motions.  May has been employed with the RLPD for over five years, in a law enforcement capacity.  On August 2, 2004, at approximately 10:25 o'clock p.m., May received a report of an incident on the Reservation, in which shots were fired from either a black Blazer, or another black vehicle.  May, who was alone in his RLPD squad car, responded to the area.

Officer Richards ("Richards") had stopped a dark Blazer, which he suspected was involved in the incident but, upon further investigation, the vehicle was not the one in the report, as it did not have a green stripe on the side of the vehicle.  Richards and May "cleared" the vehicle, meaning that Richards talked to the driver, and checked through the vehicle, which was found not to contain any weapons, nor did it have any broken windows.  After clearing the vehicle, Richards went to the new housing area, which is called the "Walking Shield" area, and discovered another black Blazer, with

---

[3](...continued)
on the record."   As augmented by our recitation of factual findings in our "Discussion," the essential factual findings, that are required by the Recommendations we make, are contained in this segment of our Opinion.  Of course, these factual findings are preliminary in nature, are confined solely to the Motions before the Court, and are subject to such future modification as the subsequent devel-opment of the facts and law may require.  See, United States v. Moore, 936 F.2d 287, 288-89 (6th Cir. 1991); United States v. Prieto-Villa, 910 F.2d 601, 610 (9th Cir. 1990).

a green stripe, that matched the physical description, as well as the partial license plate -- namely, "FUT" -- of which they had been notified by Dispatch.  In addition, the Blazer had a broken window.  Officer Richards spoke with the driver, who told him that she, and the other occupants of the vehicle, were being threatened, and that a person, whose name she provided, had pulled a gun on them.  Since the driver appeared intoxicated, Officer Richards conducted some field tests, and he arrested her.

May testified that he spoke with three or four, of the five or six individuals, who were present, including Shannon Lussier ("Lussier"), after knocking on the door of the residence of Amber Lajuenesse ("Amber").  May asked Lussier if anyone had entered the house with a gun, to which she replied in the negative.  Lussier stated that she, and the other individuals in her vehicle, were being chased by Roy, who was in another vehicle, which she described as black in color and, as a result, they went to the house. In addition, Lussier told May that Roy had a gun, that he was threatening the group of people in her vehicle, which included Janice Lajuenesse ("Janice"), and that Roy had said that he was going to shoot them.  Lussier mentioned both a handgun, and a .12-gauge, but May was not sure if she had seen the firearms, or if Roy had just mentioned them in his threats.  During the incident, John Barrett ("Barrett"), Chris Rossback

- 4 -

("Rossback"), Jennifer Lajuenesse ("Jennifer"), and Joe Lajuenesse ("Joe"), were also present in the vehicle.

May also spoke with Jennifer, who came walking out of the residence, and started talking to them. Jennifer confirmed Lussier's account of the incident, including Roy's threats but, when May asked about a gun, she acknowledged that Barrett, who was in their vehicle, had a gun. Although Jennifer had heard one shot being fired, and she saw that Barrett had a gun, it was not his that was fired. When May talked to Barrett, Barrett stated that Roy had threatened them, had said that he was going to kill them and Janice, and had said that he had a .12-gauge. May inquired about the gun that Barrett supposedly had, and Barrett responded that it was a "CO2 BB gun." Barrett also reported that Roy had smashed into their vehicle, and there was a trim piece on the front bumper that was busted, but there was no mention of body damage in May's report.[4] May attempted to talk to Rossback, who was uncooperative. Eventually, everyone who had been in the black Blazer was arrested.

After Amber came home, and while May was speaking with her, Richards was leaving the same area that they were investigating, and he advised that he had just

---

[4]May later testified that he could not recall whether he examined Roy's vehicle for body damage, after he was stopped.

encountered a black Jeep, which he suspected to be Roy's vehicle.   May drove around the housing area, which he described as a loop that extends less than one mile, and he caught up with the black Jeep.   May activated his lights, and siren, and stopped the vehicle.   After pulling their vehicles over, Roy[5] and May exited their vehicles, and when Roy approached the front of May's squad car, May informed Roy of the report, and he instructed Roy to wait by the front of the squad car.   May stated that Roy's hands were empty, and that he was not wearing a bulky coat, under which he could have been concealing a shotgun.   Additionally, May testified that he did not see Roy with any visible weapons.

Conservation Officer Shannon Barron ("Barron") arrived at the scene of the stop to assist, and remained with Roy, while May approached Roy's vehicle.   When May looked through the windows into Roy's vehicle, he observed, on the front passenger seat, a machete, and a fanny pack,[6] which was open at the time, and in which he could see shotgun shells protruding out of it.   Although May could tell that they were .12-gauge shells, he could not determine how many there were.   May

---

[5]At the Suppression Hearing, May identified Roy, and he also stated that he had previously known who Roy was, because Roy had children with May's aunt.

[6]May described the fanny pack as about ten to twelve inches long, with one or two zippers.

testified that the items were within an arm's reach of the driver. May further testified that he did not ask Roy for permission to search his vehicle, because he did not conduct a search. Rather, he was merely looking into the windows of the vehicle to check for weapons which were in plain view.

May then opened the door of the vehicle, and searched the fanny pack, which contained seven rounds of .12-gauge shells, a set of dentures, and a twenty dollar bill. He recovered both the machete and the ammunition, and he placed Roy under arrest, because of the allegations that Roy had made threats. May was aware that Roy might be a prohibited person, with respect to possession of ammunition, based on his knowledge of Roy's prior record. However, there are no felony charges available, in the Red Lake Tribal Code, and therefore, there was no charge of being a felon in possession in that Code. May testified that he arrested Roy for the following three reasons: 1) having a dangerous weapon, which included the machete that May observed, as well as the handgun, and the .12-gauge shotgun that were reported by the individuals, who were in the other vehicle that was involved in the incident;[7] 2) driving

---

[7]May testified that the presence of the ammunition corroborated the reports of Roy being in possession of either a handgun, or a shotgun.

without a license; and 3) making terroristic threats.  May placed Roy in handcuffs, and advised him of his <u>Miranda</u> rights.  See, <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966).

At some point, while May and Roy were still at the scene of the stop, before Roy had been taken into custody, and before May administered the <u>Miranda</u> warning, May asked Roy to whom the shotgun shells belonged, to which Roy responded by saying that they were not his.  May testified that the question was a part of his investigation, in order to determine what had happened.  After May read Roy his rights, and without being asked any additional questions, Roy began talking about how he could not own any guns.[8]  May quoted Roy as stating, "Those aren't mine," "I can't own any guns," and "I even got rid of my black powder rifle."  Roy continued to talk on the way to the Jail, which May characterized as Roy providing his side of the story and, although May could not recall a lot about the conversation, he testified that Roy did not say anything more that needed to be reflected in May's report.

Once they arrived at the police station, Roy was again advised of his rights, he was searched, and he was placed in a cell.  During his processing, May asked Roy about the items that had been found in his vehicle, which included the set of dentures,

---

[8]May testified that he had previously advised Roy that he knew of Roy's status as a prior felon.

the money, and the shotgun shells that were found in the fanny pack, as well as some marijuana that was located on the floor of the vehicle. Roy identified the dentures and the money as his, but not the shotgun shells, even though they were all in the same fanny pack. May testified that he never asked Roy any questions about the incident with the other people, even though he knew that Roy had called the dispatcher, and had reported that someone had shot at him.

Next, Special Agent Russell Traurig ("Traurig"), who has been employed as an Agent with the Bureau of Alcohol, Tobacco and Firearms ("BATF"), in Fargo, North Dakota, for eight years, testified. Prior to his employment with the BATF, Traurig was a Secret Service Agent for seven years, and a member of the Military Police for three years. As a BATF Agent, Traurig is responsible for the enforcement of Federal laws, which relate to firearms, explosives, and arson.

Traurig testified that he was not involved in the initial investigation of the incident, which occurred on August 2, 2004. However, shortly thereafter, Traurig was notified by the RLPD of an investigation concerning Roy. Traurig testified that such a notification was routine in firearms-related offenses. After reviewing the reports from the RLPD, Traurig determined that it was appropriate to open an investigation, because Roy was a convicted felon who reportedly had been in possession of some

ammunition, and the BATF had a previous unrelated case against Roy, which was no longer open.

Around mid-day, on August 4, 2004, Traurig traveled to Red Lake to interview Roy. Investigator Martell, and Officer Chuck Grolla, who were not involved in the investigation, accompanied Traurig, in order to show him where Roy's residence was located, and to provide back-up assistance. Prior to traveling to Roy's residence, Traurig had checked Roy's record, and discovered that he had been convicted of a felony in 1979, which signified that Roy was a prohibited person. The three individuals drove in two or three separate vehicles and, when they pulled into Roy's yard, all of them exited their vehicles, but only Traurig approached the door to Roy's residence. Traurig carried a concealed weapon, while Grolla, who was in uniform, and Martell, who was in plain clothes, had their weapons displayed.

Traurig knocked on Roy's door, and identified himself. When Roy came to the door, Traurig informed him that he wanted to talk to him. Roy responded by asking Traurig to wait for a moment and, shortly thereafter, Roy came out.[9] Traurig informed

_____

[9]Traurig testified that his conversation with Roy occurred in front of Roy's residence, and that, while the other two officers were close enough to hear the conversation, they did not participate, nor did they ask Roy any questions. The
(continued...)

Roy that he was not under arrest, nor would he be placed under arrest at the end of the interview, and that he just wanted to speak to him.  Additionally, Traurig testified that Roy was free to leave at any time, or to instruct the law enforcement personnel to leave.  Roy was not in custody, as he had just been released from Jail, which he communicated to Traurig.  When Traurig asked him if he had an attorney for that, Roy responded that he did, and identified that individual as Donald Cook, Sr. ("Cook"), who Traurig knew to be a Tribal advocate in the Red Lake Courts, as opposed to a licensed attorney.[10]  Traurig related that he had reviewed the reports, which stated that Roy had been in the possession of some ammunition, and he asked Roy if that had resulted in charges in Tribal Court, to which Roy replied that it had not.

---

[9](...continued)
interview was in normal tones, and lasted five minutes or less.

[10]Although Traurig had spoken with Cook on two unrelated occasions, he did not know him personally, nor had he spoken with either Roy or Cook, regarding whether Cook was a licensed attorney.  Rather, Traurig stated that a Red Lake official had told him that Cook was merely a Tribal advocate, and not a licensed attorney. May also testified that Cook was a defense advocate, which meant that he was not really an attorney, but rather, he was certified to defend people in Tribal Court.

Additionally, Traurig related that, if Roy had been represented by counsel, on the incident which was the subject of Traurig's investigation, his policy would have been not to talk to Roy.  However, Traurig felt that he was "on solid ground" anyway, because the Red Lake Indian Reservation does not have any charges comparable to the charge of being a felon in possession of ammunition.

During the course of the interview, Traurig asked Roy about his prohibited status, to which Roy replied by stating that he was a felon, and that he was not supposed to have firearms.  Roy also explained that the incident, in question, had involved a traffic altercation with some "kids," who had "flipped him off," to which he had replied that he would "shove the finger up their ass."  Roy also stated, in response to Traurig's question, that he did not have a gun during the incident, but that "some people" had told him to go get a "shotgun" from "over there."[11]  Roy also informed Traurig that he had told those people that he could not have a gun.  Roy admitted that he knew that he had the seven (7) .12-gauge shotgun rounds in his possession, and he acknowledged that they were located in a "fanny pack," which had been found in his vehicle.  Traurig advised Roy that he was prohibited from possessing both firearms and ammunition, to which Roy replied that it was something that he would have to "deal with."

Traurig also asked for Roy's consent to search his residence, which he refused and, as a result, Traurig discontinued the interview, and left.  Traurig testified that he had no recollection of any further discussion about the incident -- namely, regarding

---

[11]Traurig stated that he did not ask who those individuals were, because he was able to ascertain their identities from the police reports.

the search of Roy's vehicle, or the machete that had been taken -- nor had he taken any other statements from Roy.  Traurig stated that the RLPD initially took possession of the evidence, and that he later took possession of the ammunition, which was currently being tested for fingerprints and/or for DNA evidence.  Traurig stated that he did not recall asking Roy any questions about the origin of the shotgun shells.[12]

Subsequent to the Suppression Hearing, and with leave of the Court, the Government submitted documentation from the Red Lake Tribal Court, which lists attorneys in one section, and "lay advocates" in another.  Cook is listed as a lay advocate.  See, <u>Government Exh. 1</u>.  In addition, the Government submitted a Resolution from the Red Lake Band of Chippewa Indians, in which Cook's application to practice as lay counsel, in the Red Lake Nation Courts, is granted.  See, <u>Government Exh. 2</u>.

III.  <u>Discussion</u>

Roy argues that the search of his vehicle was conducted illegally, because it was a warrantless search, and because there was neither probable cause, nor consent to

---

[12]At the close of Traurig's testimony, he stated that he had retained his field notes, which the Defendant asked to be preserved.  The Government does not oppose the Defendant's request, and therefore, we grant the same.

search.  Roy further contends that the statements he made to Traurig, or to any other

officers who accompanied Traurig, were taken in violation of <u>Edwards v. Arizona</u>, 451

U.S. 477 (1981), as well as the Fifth and Sixth Amendments, because the law

enforcement officials were aware that Roy had an attorney in connection with the

charges that were filed in the Red Lake Tribal Court, which arose from the incident in

question.  We address his Motions, in turn.

 A. <u>Roy's Motion to Suppress Evidence Obtained as a Result of Search and
   Seizure</u>.

  As an initial matter, Roy does not challenge the stop of his vehicle, nor

does he challenge his arrest.  Rather, he only challenges the search that occurred at the

scene.  In any event, we find that May had reasonable suspicion to conduct the stop

of Roy's vehicle, based on the consistent reports of the incident, by the individuals

in the black Blazer that, during the altercation, Roy had made various threats against

them.  See, <u>Thomas v. Dickel</u>, 213 F.3d 1023, 1025 (8th Cir. 2000) ("Reasonable

suspicion requires '"a particularized and objective basis" for suspecting the person

stopped of criminal activity,'" and is not as demanding a standard as that of "probable

cause.'"'"), quoting <u>Ornelas v. United States</u>, 517 U.S. 690, 696 (1996), quoting, in

turn, <u>United States v. Cortez</u>, 449 U.S. 411, 417 (1981).  We further find that the

search of Roy's vehicle, as well as his subsequent arrest, were lawful, as we explain

in further detail.

      1.   <u>Standard of Review</u>.  The "plain view" doctrine is a recognized

exception to the general Warrant requirement, and permits the lawful seizure of

incriminating evidence, that is in the "plain view" of the searching officers.  As

explained in <u>United States v. Murphy</u>, 69 F.3d 237, 241-42 (8th Cir. 1995), cert.

denied, 516 U.S. 1153 (1996):

> The plain view doctrine allows police officers to seize
> evidence without a warrant when (1) "the officer did not
> violate the Fourth Amendment in arriving at the place from
> which the evidence could be plainly viewed," (2) the ob-
> ject's incriminating character is immediately apparent, and
> (3) the officer has "a lawful right of access to the object
> itself." United States v. Hughes, 940 F.2d 1125, 1126-27
> (8th Cir. [1991])(quoting Horton v. California, [496 U.S.
> 128, 136-37] (1990)), cert. denied, [502 U.S. 896] (1991).

"The 'immediately apparent' requirement means that officers must have 'probable

cause to associate the property with criminal activity.'" <u>United States v. Hatten</u>, 68

F.3d 257, 261 (8th Cir. 1995), cert. denied, 516 U.S. 1150 (1996), quoting <u>United</u>

<u>States v. Garner</u>, 907 F.2d 60, 62 (8th Cir. 1990), cert. denied, 498 U.S. 1068 (1991).

Of course, "[p]robable cause demands not that an officer be 'sure' or 'certain' but

only that the facts available to a reasonably cautious man would warrant a belief 'that

certain items may be contraband or stolen property or useful as evidence of a crime.'"

Id.

Furthermore, in the context of automobiles, our Court of Appeals has reiterated:

> As long as law enforcement officials have probable cause, they may search an automobile without a warrant under the automobile exception.  See Pennsylvania v. Labron, [518 U.S. 938, 940] (1996); [United States v.] Martinez, 78 F.3d [399] at 401 [(8th Cir. 1996)].  Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place. See Illinois v. Gates, [462 U.S. 213, 238] (1983).

United States v. Fladten, 230 F.3d 1083, 1085 (8th Cir. 2000).

    2.    Legal Analysis.   We have already found, and Roy has not contested, that the stop of his vehicle was proper.  The crux of Roy's Motion appears to be that, when May approached Roy's vehicle, and looked into the interior of the vehicle through its windows, he conducted a search, which was without a warrant, probable cause, or consent, and therefore, that any subsequent search of the vehicle, committed by way of May's entry into the vehicle, was illegal.  We disagree.

    Our Court of Appeals has repeatedly held that, when an officer examines a vehicle's interior through its windows, no Fourth Amendment violation has occurred. See, United States v. Gillon, 348 F.3d 755, 759-60 (8th Cir. 2003); United States v.

- 16 -

Jordan, 187 F.3d 644, 1999 WL 163633 (8th Cir., March 19, 1999); United States v.

Beatty, 170 F.3d 811, 814 (8th Cir. 1999); United States v. Hatten, supra at 260-61

(holding that an officer's conduct in looking through a vehicle's window was not a

search). Furthermore, in all of those cases, the occupants had exited their vehicles at

the time that the officers looked through the windows. Id. "'All that is required is that

at the time the officers observed the weapon in the car, they must have had a right to

be in close proximity to the car at a point from which the observation occurred.'"

United States v. Hatten, supra at 260, quoting United States v. Webb, 533 F.2d 391,

394 (8th Cir. 1976). "'[A] truly cursory inspection -- one that involves merely looking

at what is already exposed to view, * * * -- is not a "search" for Fourth Amendment

purposes, and therefore does not even require reasonable suspicion.'" Id. at 261,

quoting Arizona v. Hicks, 480 U.S. 321, 328 (1987).

In United States v. Beatty, supra, the defendant argued that, since he and his

passenger had already exited the truck, the officer had no justification for

reapproaching the vehicle to look inside. The Court rejected that argument, and stated

that, "[i]n order to look inside the truck, [the officer] did not need 'probable cause,

or even reasonable suspicion that crime [was] afoot.'" Id. at 814, quoting United

States v. Hatten, supra at 260. Similarly, in United States v. Gillon, supra, the

- 17 -

defendant was seated in the back of the patrol car, when the officers approached the

vehicle, and looked through the car's window.   The Court applied the plain view

doctrine, and stated that "the officer's activity in looking in the window of the car was

lawful in any case."   Id. at 759-60 (finding that the police were lawfully in close

proximity to the vehicle, where they had executed a traffic stop of the defendant on a

public road); see also, United States v. McKibben, 928 F. Supp. 1479, 1481 (D.S.D.

1996)("The officer's actions in looking through the vehicle's open window, even with

the aid of a flashlight, did not constitute a 'search.'").

Here, as we have noted, May had lawfully stopped Roy's vehicle, and therefore,

his examination of the vehicle's interior, by looking through its windows, was lawful,

and did not constitute a search.   Furthermore, the incriminating nature of the .12-gauge

shotgun shells, which were protruding from the open fanny pack, was readily apparent,

in light of the earlier accusations that Roy had been threatening a group of individuals,

and there were reports that he had a .12-gauge shotgun.   Additionally, May had prior

knowledge of Roy's status as a person prohibited from possessing ammunition.

Under the plain view doctrine, May was entitled to seize the shotgun shells, which

provided sufficient probable cause to justify a further search of the vehicle, and the

existence of probable cause rendered it unnecessary for May to obtain a Search

Warrant for the automobile.[13]   Accordingly, we recommend that Roy's Motion to

Suppress Evidence Obtained as a Result of Search and Seizure be denied.[14]

---

[13]Since it is not apparent whether the marijuana, which was located on the floor of the vehicle, was observed in plain view, we do not rely on its presence as further support for our probable cause determination.

[14]Although Roy has not directly raised the issue, we further find, in the interests of completeness, that Roy's arrest was valid.  It is undisputed that Roy's arrest was warrantless, but that fact alone does not render the arrest unlawful.  When a police officer has probable cause to believe that a person has committed a felony, a warrantless arrest is permitted.  United States v. Travis, 993 F.2d 1316, 1323 (8th Cir. 1993), citing United States v. Watson, 423 U.S. 411 (1976).

"Determining probable cause to arrest requires the court to focus on the moment the arrest was made and to ask whether 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'"  United States v. Taylor, 106 F.3d 801, 803 (8th Cir. 1997), quoting Beck v. Ohio, 379 U.S. 89, 91 (1964).  We keep in mind, however, that "[p]robable cause does not require a prima facie showing of criminal activity, but only the probability of criminal activity."  Tokar v. Bowersox, 198 F.3d 1039, 1047 (8th Cir. 1999).  We find that the combination of the alleged threats made by Roy, and May's observation of the .12-gauge shotgun shells in the front seat of Roy's vehicle, provided sufficient probable cause for May to arrest Roy.

- 19 -

B.    Roy's Motion to Suppress Statements, Admissions, and Answers.

1.    Standard of Review.   Government agents are not required to administer Miranda warnings to everyone whom they question.   See, Oregon v. Mathiason, 429 U.S. 492, 495 (1977).   Rather, Miranda warnings are required for official interrogations where a person has been "'taken into custody or otherwise deprived of his freedom of action in any significant way.'"   Stansbury v. California, 511 U.S. 318, 322 (1994), quoting Miranda v. Arizona, 384 U.S. 436, 444 (1966); United States v. Helmel, 769 F.2d 1306, 1320 (8th Cir. 1985); Berkemer v. McCarty, 468 U.S. 420, 428-29 (1984).

Whether an accused was subjected to custodial interrogation is to be determined from the totality of the circumstances. See, United States v. Hanson, 237 F.3d 961, 963 (8th Cir. 2001); California v. Beheler, 463 U.S. 1121, 1125 (1983).  In determining whether a suspect is "in custody," we examine whether the extent of the physical or psychological restraints, which were imposed upon the Defendant, during an interrogation by law enforcement, would have been understood by a "reasonable person in the [Defendant's] position" as being consonant with the condition of being in custody.  Berkemer v. McCarty, supra at 442; United States v. Cates, 251 F.3d 1164, 1166 (8th Cir. 2001); United States v. Carter, 884 F.2d 368, 370 (8th Cir. 1989).

As the Court in <u>United States v. Griffin</u>, 922 F.2d 1343, 1357 (8th Cir. 1990), stated: "If [the Defendant] believed his freedom of action had been curtailed to a 'degree associated with formal arrest,' and that belief was reasonable from an objective viewpoint, then [the Defendant] was being held in custody during the interrogation." See also, <u>Stansbury v. California</u>, supra at 1529; <u>United States v. Chamberlain</u>, 163 F.3d 499, 503 (8th Cir. 1998).

Under the law of this Circuit, the relevant factors to be considered in making a determination of custody include an accused's freedom to leave the scene, and the purpose, place and length of the interrogation. See <u>United States v. Griffin</u>, supra at 1349. The most comprehensive list of factors -- although admittedly not exhaustive -- was enumerated, as follows, in <u>United States v. Griffin</u>, supra at 1349:

> [The] inquiry into the indicia of custody has generally focused on an examination of (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated;

or, (6) whether the suspect was placed under arrest at the termination of the questioning.

The Court has regarded the first three of the <u>Griffin</u> factors as mitigative in their effect upon the ultimate determination, for the presence, during questioning, of one or more of those factors would tend to weigh against a finding of custody.  On the other hand, the remaining three factors have been characterized as coercive in their effect, since those factors would tend to accentuate the existence of custody.  A "finding of custody does not, however, have to be supported by all six factors."  <u>United States v. Galceran</u>, 301 F.3d 927, 930 (8th Cir. 2002), citing <u>United States v. Griffin</u>, supra at 1349; see also, <u>United States v. McKinney</u>, 88 F.3d 551, 554 (8th Cir. 1996).

If a person is subjected to a custodial interrogation, he or she "has the right to consult with an attorney and to have counsel present during questioning."  <u>Davis v. United States</u>, 512 U.S. 452, 457 (1994).  To exercise that right, however, a suspect "must unambiguously request counsel," which "'requires at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'"  <u>Id.</u>, at 459, quoting <u>McNeil v. Wisconsin</u>, 501 U.S. 171, 178 (1991).  Furthermore, "if a suspect makes a reference to an attorney that is ambiguous or equivocal * * * [such] that the suspect *might* be invoking his right to

counsel, our precedents do not require the cessation of questioning." Id.  In addition,

"the Sixth Amendment right to counsel 'does not attach until a prosecution is

commenced, that is, at or after the initiation of adversary judicial criminal proceedings

-- whether by way of formal charge, preliminary hearing, indictment, information, or

arraignment." Von Kahl v. United States, 242 F.3d 783, 789 (8th Cir. 2001), quoting

McNeil v. Wisconsin, supra at 175.

       "The right to counsel recognized in Miranda is sufficiently important to suspects

in criminal investigations, * * * that it 'requir[es] the special protection of the knowing

and intelligent waiver standard.'" Davis v. United States, 512 U.S. 452, 458 (1994),

quoting Edwards v. Arizona, 451 U.S. 477, 483 (1981).  Nevertheless, "[i]f the suspect

effectively waives his right to counsel after receiving the Miranda warnings, law

enforcement officers are free to question him." Id., citing North Carolina v. Butler,

441 U.S. 369, 372-376 (1979); see also, United States v. Jones, 23 F.3d 1307, 1313

(8th Cir. 1994).  The burden rests with the Government to prove, by a preponderance

of the evidence, that the Defendant knowingly and voluntarily waived his Miranda

rights.  See, Colorado v. Connelly, 479 U.S. 157, 168 (1986); United States v.

Dougherty, 810 F.2d 763, 773 (8th Cir. 1987).  However, "Miranda has no application

to statements * * * that are voluntarily offered and are not a product of either express

questioning or any police practice reasonably likely to evoke an incriminating response." United States v. Griffin, 922 F.2d 1343, 1357 (8ᵗʰ Cir. 1990), citing United States v. McGauley, 786 F.2d 888, 891 (8ᵗʰ Cir. 1986), and United States v. Webster, 769 F.2d 487, 492 (8ᵗʰ Cir. 1985).

Further, the Supreme Court has recognized that, in order for a confession to be admitted into evidence, it must be voluntary if it is to satisfy the Fifth Amendment's right against self-incrimination. See, Dickerson v. United States, 530 U.S. 428, 433-34 (2000). For a confession to be considered voluntary, a Court must examine "'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." Dickerson v. United States, supra at 434, citing Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973).

As the Supreme Court has recently explained:

> The due process test takes into consideration "the totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation." [Schneckloth v. Bustamonte, 412 U.S. at 226.] See also Haynes [v. Washington, 373 U.S. 503, 513] (1963); Gallegos v. Colorado, [370 U.S. 49, 55] (1962); Reck v. Pate, [367 U.S. 433, 440] (1961) ("[A]ll the circumstances attendant upon the confession must be taken into account"); Malinski v. New York, [324 U.S. 401, 404] (1945)("If all the attendant circumstances indicate that the confession was coerced or compelled, it may not be used

- 24 -

> to convict a defendant").   The determination "depend[s]
> upon a weighing of the circumstances of pressure against
> the power of resistance of the person confessing."   Stein v.
> New York, [346 U.S. 156, 185] (1953).

Id. at 434.

Among the circumstances, which are to be considered in this analysis are, first and

foremost, whether a Miranda warning has been given, see, Withrow v. Williams, 507

U.S. 680, 693 (1993); any elements of "police coercion," see, Colorado v. Connelly,

479 U.S. 157, 167 (1986); the length of the interrogation, see, Ashcraft v. Tennessee,

322 U.S. 143, 153-154 (1944); the location of the interrogation, see, Reck v. Pate, 367

U.S. 433, 441 (1961); and the continuous nature of the interrogation, see, Leyra v.

Denno, 347 U.S. 556, 561 (1954).  See also, Withrow v. Williams, supra at 693 (listing

the applicable considerations).

      2.   Legal Analysis.  Although it appears that Roy challenges only the

statements he made to Traurig, we briefly consider his statements to May, in the

interests of completeness.

      a.   Roy's Statements to May.  Prior to administering a Miranda

warning, May asked Roy about the ownership of the shotgun shells.  May further

testified, and we find, that the question was asked before Roy was taken into custody.

Thus, we conclude that, at that point in time, Roy was subject to a Terry stop.

"Miranda warnings are not necessary during ordinary Terry stops because they generally do not amount to custodial interrogation."  United States v. Johnson, 64 F.3d 1120, 1126 (8th Cir. 1995), cert. denied, 516 U.S. 1139 (1996), citing  Berkemer v. McCarty, supra at 439-40; see also, United States v. McGauley, 786 F.2d 888, 890 (8th Cir. 1986)("No Miranda warning is necessary for persons detained for a Terry stop."); United States v. Pelayo-Ruelas, 345 F.3d 589, 592 (8th Cir. 2003).

As the Court explained, in United States v. Pelayo-Ruelas, supra at 592, quoting Berkemer v. McCarty, supra at 439-40:

> The [Terry] stop and inquiry must be reasonably related in scope to the justification for their initiation.  Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions.  But the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released.  The comparatively non-threatening character of detentions of this sort explains the absence of any suggestion in our opinions that Terry stops are subject to the dictates of Miranda.  The similarly noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not "in custody" for the purpose of Miranda.

We accept, as did the Court in Pelayo-Ruelas, that "[o]ne is not free to leave a Terry stop until the completion of a reasonably brief investigation, which may include limited

- 26 -

questioning[,] * * * [b]ut most Terry stops do not trigger the detainee's Miranda rights." Id.

We find that the questioning, at the scene of the vehicle stop, and prior to Roy's arrest, was wholly within the scope of a Terry stop. As we have noted, May had effected a Terry stop of Roy, but Roy was not in custody at the time that he inquired about the shotgun shells. As a result, a Miranda warning was unnecessary, and the lack thereof does not render the answers to the questions inadmissible. See, United States v. Johnson, supra at 1126 ("Miranda warnings are not necessary during ordinary Terry stops because they generally do not amount to custodial interrogation."), citing Berkemer v. McCarty, supra at 439-40; United States v. McGauley, supra at 890 ("No Miranda warning is necessary for persons detained for a Terry stop."); United States v. Pelayo-Ruelas, 345 F.3d 589, 592 (8th Cir. 2003).

In addition, we find that Roy's other comments to May, which were made after Roy was taken into custody, and read his Miranda rights, were voluntary and spontaneous, and that they were not the product of interrogation. Our Court of Appeals has "'repeatedly held that "[a] voluntary statement made by a suspect, not in response to interrogation, is not barred [by the Fifth Amendment] and is admissible with or without the giving of Miranda warnings."'" United States v. Turner, 157 F.3d

552, 556 (8th Cir. 1998), quoting <u>United States v. Hatten</u>, supra at 261, quoting, in turn,

<u>Rhode Island v. Innis</u>, 446 U.S. 291, 299 (1980); <u>United States v. Cunningham</u>, 133

F.3d 1070, 1074 (8th Cir. 1998)(where officers merely listen to suspect, nothing

prohibits use of suspect's statements against him); <u>United States v. Hayes</u>, 120 F.3d

739, 744 (8th Cir. 1997)("'<u>Miranda</u> does not protect an accused from a spontaneous

admission made under circumstances not induced by the investigating officers or

during a conversation not initiated by the officers.'"), quoting <u>United States v.</u>

<u>Hawkins</u>, 102 F.3d 973, 975 (8th Cir. 1996), citing, in turn, <u>Butzin v. Wood</u>, 886 F.2d

1016, 1018 (8th Cir. 1989); <u>United States v. Kalter</u>, 5 F.3d 1166, 1168-69 (8th Cir.

1993)(<u>Miranda</u> does not require suppression of spontaneous utterances which are not

the product of interrogation); <u>United States v. Waloke</u>, 962 F.2d 824, 828-29 (8th Cir.

1992) (suspect's spontaneous statements, while in transit to a detention center, were

voluntary, were not the product of interrogation, and did not require the administration

of a <u>Miranda</u> warning).   We further note that there is no evidence, in this Record,

which suggests that Roy ever invoked his <u>Miranda</u> rights, at any point during his

interaction with May.   Accordingly, to the extent that Roy challenges his statements

to May, we recommend that his Motion to Suppress Statements, Admissions, and

Answers be denied.

- 28 -

b.    <u>Roy's Statement to Traurig</u>.    As we have noted, Roy contends that the statements he made to Traurig were taken in violation of <u>Edwards v. Arizona</u>, supra, as well as the Fifth and Sixth Amendments, because he had an attorney in connection with the charges that had been filed in the Red Lake Tribal Court.

When Traurig began speaking to Roy, Roy informed him that he had just been released from Jail, and that he had an attorney -- namely, Cook -- for those charges. However, both Traurig, and May, testified that Cook is not an attorney licensed to practice law, apparently, in the State of Minnesota or elsewhere.  Rather, he is a "Tribal advocate," which May explained to be a position that is certified to defend people in Tribal Court.  Government Exhibits 1 and 2 confirm the testimony of Traurig and May, and they demonstrate that Cook is listed as a "Lay Advocate," or "lay counsel," who is approved to practice in the Red Lake Nation Courts.   See, <u>Government Exhs. 1 and 2</u>.  Additionally, both Traurig, and May, testified that the Red Lake Tribal Code does not have a charge comparable to that of being a felon in possession of ammunition and, in fact, May testified that the Red Lake Tribal Code does not provide for any felony charges.

- 29 -

As an initial matter, we note that Roy was not subject to a custodial interrogation by Traurig.  Although three law enforcement officers were present, the interview occurred at Roy's home, Roy was not restrained in any way, and he was specifically informed that he was not under arrest, and would not be placed under arrest at the end of the questioning.  Additionally, Traurig testified that Roy was free to leave at any time, or to instruct the officers to leave and, when Roy refused Traurig consent to search his residence, Traurig terminated the interview, and the officers left, without arresting Roy.  Since Roy was not subjected to a custodial interrogation, Traurig was not obligated to administer a <u>Miranda</u> warning.  See, <u>Stansbury v. California</u>, supra; <u>United States v. Helmel</u>, supra at 1320; <u>Berkemer v. McCarty</u>, supra at 428-29.

With regard to the rule announced in <u>Edwards v. Arizona</u>, supra, it is unclear whether Roy claims that the alleged violation occurred as a result of a prior invocation of his Fifth, or Sixth Amendment rights, in conjunction with his earlier arrest on Tribal charges, or whether he claims that his reference to the fact that he had an attorney invoked his right to counsel, such that <u>Edwards</u> would require the cessation of questioning, were he in custody.

In order to successfully invoke a right to counsel, a suspect's request must be unambiguous, and unequivocal.  See, <u>Davis v. United States</u>, supra at 459; <u>McNeil v.</u>

- 30 -

Wisconsin, supra at 178.  Furthermore, "if a suspect makes a reference to an attorney that is ambiguous or equivocal * * * [such] that the suspect *might* be invoking his right to counsel, our precedents do not require the cessation of questioning."  Id.

Pursuant to Edwards, in the context of the Fifth Amendment, "[a] suspect who invokes the Miranda right to counsel may not be reapproached by police unless counsel is made available."  United States v. Harris, 221 F.3d 1048, 1051 (8th Cir. 2000).  However, "[t]he Supreme Court has suggested, in dictum, that a break in custody defeats Edwards protection."  Id., citing McNeil v. Wisconsin, 501 U.S. 171, 177 (1991)("If the police do subsequently initiate an encounter in the absence of counsel (assuming there has been no break in custody), the suspect's statements are presumed involuntary * * *.").  Our Court of Appeals noted that at least six Courts of Appeal had adopted a consistent rule, which "expressly limit[ed] Edwards protection to those suspects who remain in **continuous** custody from the time they request counsel to the time they are interrogated again."  Id. at 1052 (citing cases)[emphasis in original]; see also, United States v. Arrington, 215 F.3d 855, 856-57 (8th Cir. 2000).  Further, the Court recognized that, in Holman v. Kemna, 212 F.3d 413, 419 (8th Cir. 2000), it had "effectively agreed to go **beyond** [United States v.] Skinner [667 F.2d

1306, 1309 (9th Cir. 1982)], finding that Edwards protection might be unavailable even to some suspects who **had** remained in continuous custody." Id. at 1052.

We find that Edwards is inapplicable here.  First, there is no evidence that Roy invoked his Fifth Amendment right to remain silent, or his right to counsel, at any time following his arrest by May, on August 2, 2004, and prior to the interrogation by Traurig.  In fact, the Record is almost entirely silent as to what transpired between the time that Roy was jailed, and the time that Traurig interviewed him.  Even if he had previously invoked his right to counsel, Roy did not remain in "continuous custody," and therefore, the protections of Edwards do not apply.

Additionally, we find that, during Roy's interview with Traurig, Roy's mere reference to Cook, who Roy understood to be his attorney, was insufficient to invoke his Fifth Amendment right to an attorney, such that Traurig was required to cease his questioning.[15]  See, Quadrini v. Clusen, 864 F.2d 577, 582-83 (7th Cir. 1989)(holding

---

[15]We question, as did the Court in United States v. Eastman, "whether a person who is admitted to practice law in tribal court, but not elsewhere, is a 'lawyer' within the meaning of Miranda v. Arizona."  In a different context, we note that the "Sixth Amendment's guarantee of right to counsel does not extend to lay counsel."  United States v. Matthies, 201 F.3d 445, 1999 WL 997321 (9th Cir., November 2, 1999), citing United States v. Turnbull, 888 F.2d 636, 638 (9th Cir. 1989)(recognizing that the term "counsel" means a licensed attorney admitted to the District Court bar); see also,
(continued...)

that the defendant's production of a public defender's business card, and his assertion that the public defender had told him not to make a statement, were insufficient to invoke his right to counsel), cited by <u>Middleton v. Murphy</u>, 996 F.2d 1219, 1993 WL 217156 at *6 (7th Cir., June 21, 1993)(incorporating the District Court's opinion, 1992 WL 601890 (W.D. Wis., January 28, 1992), which stated that "[t]he officers [in <u>Quadrini</u>] knew that the suspect had met already with a lawyer about the charges he faced, but that alone was not enough to invoke his right to counsel," because "the suspect had to ask for the lawyer to be present at the interrogation"); <u>United States v. Segal</u>, 207 F. Supp.2d 835, 841 (N.D. Ill. 2002) (holding that the defendant did not invoke his right to counsel, when he told the officers "you can talk to my lawyer"); <u>Williams v. Larson</u>, 2003 WL 1785807 (N.D. Cal., March 31, 2003)(holding that the defendant's statement that he had talked to counsel, who had told him not to talk, was not an invocation of the right to counsel); <u>United States v. Sprouse II</u>, 2002 WL 15866 (W.D. Va., January 8, 2002)(same); <u>United States v. Blumberg</u>, 2000 WL 761882 (D. Me., March 14, 2000)("A suspect does not invoke the right to counsel every time he uses the word 'attorney' or mentions an attorney by name."); cf., <u>Bruni v. Lewis</u>, 847

---

[15](...continued)
<u>United States v. Schmitt</u>, 784 F.2d 880, 882 (8th Cir. 1986).

F.2d 561, 564 (9th Cir. 1988)(holding that the defendant did not unambiguously invoke his right to counsel when he stated, in response to an officer's request that he answer questions, "[n]ot without my attorney," and then immediately added, "[w]ell, ask your questions and I will answer those I see fit").

Finally, we note that there was no evidence presented that Roy ever invoked his Sixth Amendment right to counsel.  Even if there was, however, the Supreme Court has held that, "[t]o invoke the Sixth Amendment [right to counsel] is, as a matter of **fact, not** to invoke the <u>Miranda-Edwards</u> interest." <u>McNeil v. Wisconsin</u>, supra at 178 [emphasis in original].  Since there is no evidence, in the Record before us, that Roy ever invoked his right to counsel, either before or during the interview with Traurig, the rule of <u>Edwards v. Arizona</u> did not preclude Traurig's questioning of Roy.[16] Accordingly, we turn our analysis to the Sixth Amendment protections.

As we have noted, "the Sixth Amendment right to counsel 'does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings -- whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." <u>Von Kahl v. United States</u>, 242 F.3d 783,

---

[16]We further find that the statements that Roy made to May, and to Traurig, were voluntary, as there is no evidence to the contrary.

789 (8th Cir. 2001), quoting <u>McNeil v. Wisconsin</u>, supra at 175.  Thus, the question

becomes whether the charges against Roy, under the Red Lake Tribal Code, caused

Roy's Sixth Amendment rights to attach.  Again, we note that the Record is sparse as

to what transpired between the time that Roy was arrested and booked, and the time

of Traurig's interview.  For instance, we do not know whether charges were formally

filed, or whether an arraignment, or some other legal proceeding, occurred in Tribal

Court.  For that reason alone, Roy might not be entitled to the protections of the Sixth

Amendment.  See, <u>United States v. Eastman</u>, 256 F. Supp.2d 1012, 1016-17 (D.S.D.

2003)(noting that there was no persuasive evidence that the defendant had been

formally charged, and holding that, "[b]ecause no adversary judicial criminal

proceedings had been initiated against him in tribal court, or elsewhere, [the

defendant's] Sixth Amendment right to counsel * * * never attached").

Even assuming that Roy did make an appearance in Tribal Court, we would,

nevertheless, find that the Sixth Amendment right to counsel had not attached.  There

is a paucity of authority regarding the effect that the initiation of Tribal proceedings has

on the attachment of Sixth Amendment rights in the Federal Courts of law.  The

primary cases have been issued from the Sixth Circuit, the Eighth Circuit, and the

Ninth Circuit.  At first blush, it would appear that the authority from our own Court of

Appeals would control the outcome of this matter.  However, the context in which our Court of Appeals considered the impact of Tribal proceedings appears to be unique to one particular Tribe, and is distinguishable from the circumstances with which we are presented.  We begin our analysis by reviewing the general principles of Sixth Amendment jurisprudence, in the context of Tribes.

"Neither the Sixth Amendment nor any of the other guarantees of individual rights in the United States Constitution apply of their own force to Indian tribes." United States v. Doherty, 126 F.3d 769, 777 (6th Cir. 1997), partially abrogated on other grounds, Texas v. Cobb, 532 U.S. 162 (2001); see also, Santa Clara Pueblo v. Martinez, 436 U.S. 49, 56 (1978), citing Talton v. Mayes, 163 U.S. 376 (1896). Instead, "[t]he right to an attorney in tribal court is guaranteed by the Indian Civil Rights Act (ICRA), 25 U.S.C. §1302(6)(2001), but only at the expense of the defendant." United States v. Red Bird, 287 F.3d 709, 713 (8th Cir. 2002)("Red Bird II"). Thus, as a general rule, a defendant's right to counsel in Tribal proceedings is statutory, and not constitutional.  See, United States v. Doherty, supra at 782.

Outside of our Court of Appeals, the Courts which have confronted the issue have held that, because the Sixth Amendment does not apply in Tribal Court proceedings, an arraignment in Tribal Court does not result in the attachment of the

Sixth Amendment rights.  See, <u>United States v. Charley</u>, 396 F.3d 1074, 1082-83 (9th Cir. 2005)("That [the defendant] was arraigned in tribal court * * * is irrelevant to determining when her Sixth Amendment right to counsel attached because we have squarely held that 'the Sixth Amendment right to counsel does not apply in tribal court criminal proceedings.'"), quoting <u>United States v. Percy</u>, 250 F.3d 720, 725 (9th Cir. 2001); see also, <u>United States v. Doherty</u>, supra.  Thus, under those authorities, Roy's Sixth Amendment rights had not attached at the time that Traurig conducted his interview, even though some proceedings may have been initiated in Tribal Court.[17]

However, the Courts within our Circuit, which have confronted the issue presented, have reached a different conclusion, and have held that an arraignment in Tribal Court is sufficient to trigger the protections of the Sixth Amendment.  See, <u>United States v. Red Bird</u>, 146 F. Supp.2d 993 (D.S.D. 2001), aff'd, <u>Red Bird II</u>, supra; <u>United States v. Swift Hawk</u>, 125 F. Supp.2d 384 (D.S.D. 2000).  In each of those cases, the Courts were confronted with crimes committed by members of the Rosebud Sioux Tribe, which is unique among Tribes, in that the Rosebud Sioux Tribal

---

[17]Again, we emphasize that we have been presented with no evidence that any proceedings occurred in Tribal Court, let alone what those proceedings were, in order to undertake a more detailed analysis of the possible attachment of Roy's Sixth Amendment rights.

- 37 -

Constitution "guarantees the right to be represented by an attorney, and the tribe provides indigent defendants with a licensed attorney from the tribal public defender's office." Red Bird II, supra at 713.

Additionally, in Red Bird, the Courts took particular notice of the way in which the Tribal authorities, and the Federal Agents, worked "in tandem * * * to deliberately elicit information from [the defendant], knowing that [he] had been indicted in an adversarial proceeding for the same charge and that [the defendant] was represented by an attorney on that charge." Id. at 714; see also, United States v. Swift Hawk, supra at 386-89 (noting that "the federal government and the tribe, two sovereigns, were cooperating in the investigation and charging of the defendant," and that they were "working in tandem" on charges that were essentially identical).

We find that the decisions of Red Bird and Swift Hawk, are distinguishable. Here, there is no evidence that the Red Lake Tribe has a Constitution, which contains a provision for the appointment of counsel for indigent defendants, at the expense of the Tribe, similar to that of the Rosebud Sioux Tribal Constitution. Rather, Roy identified his "attorney" as Cook, who is, in reality, a Tribal or lay advocate, and not a licensed attorney. Unlike Roy, the defendant in Red Bird "had been appointed an attorney who was licensed to serve him in both tribal and federal court." Red Bird II,

- 38 -

supra at 714.   In addition, we find that the Federal and tribal authorities were not

working "in tandem."   Unlike the defendants in <u>Swift Hawk</u> and <u>Red Bird</u>, and as we

later explain in greater detail, the offenses for which Roy was apparently charged, in

the Tribal context, differ from the offense which Traurig was investigating -- namely,

felon in possession of ammunition -- even though all of the charges arose out of the

same general incident.   Furthermore, the officers that accompanied Traurig did not

participate in the interview of Roy.   Accordingly, we find that the decisions of the

Courts in <u>Swift Hawk</u>, and <u>Red Bird</u>, are confined to the unique characteristics of the

Rosebud Sioux Tribe -- particularly insofar as that Tribe provides for a right to

appointed, and licensed legal counsel, at the Tribe's expense -- and do not apply to

the facts of this matter.   Instead, we rely on the holding in <u>United States v. Charley</u>,

that an arraignment in Tribal Court, if one even occurred here, did not trigger the

protections of Roy's Sixth Amendment rights, and therefore, Traurig's interrogation

was not in violation of any such rights.

Even if we were to conclude that Roy's Sixth Amendment rights attached, we

would still find that Roy's Sixth Amendment rights had not been violated, by Traurig's

interrogation.   As our Court of Appeals has recently stated, <u>Texas v. Cobb</u>, 532 U.S.

162 (2001) "makes it uncompromisingly clear that the Sixth Amendment right * * * is

- 39 -

'offense specific.'" <u>United States v. Johnson</u>, 352 F.3d 339, 343 (8th Cir. 2003); see

also, <u>United States v. Kraft</u>, 2005 WL 578313 at *3 (D. Minn., March 11, 2005).  The

Sixth Amendment "cannot be invoked once for all future prosecutions, for it does not

attach until a prosecution is commenced, that is, at or after the initiation of adversary

judicial criminal proceedings -- whether by way of formal charge, preliminary hearing,

indictment, information or arraignment." <u>United States v. Kraft</u>, supra at *3, quoting

<u>Texas v. Cobb</u>, supra at 167-68.  "[W]hether an offense is the same for Sixth

Amendment purposes depends, in the first instance, on the 'test' laid out for double-

jeopardy purposes in <u>Blockburger v. United States</u>, 284 U.S. 299, 304, 52 S.Ct. 180,

76 L.Ed. 306 (1932)." <u>United States v. Johnson</u>, supra at 343.  In <u>Blockburger v.</u>

<u>United States</u>, supra at 304, the Supreme Court stated that, "where the same act or

transaction constitutes a violation of two distinct statutory provisions, the test to be

applied to determine whether there are two offenses or only one, is whether each

provision requires proof of a fact which the other does not."  Pursuant to <u>Texas v.</u>

<u>Cobb</u>, "[e]ven if an uncharged crime is factually related to a charged crime, if the

uncharged crime is distinct, meaning that it requires proof of some element that the

other crime does not, the Sixth Amendment will not attach." <u>United States v. Paz</u>, 124

Fed.Appx. 743, 2005 WL 548198 at *1 (3ʳᵈ Cir., March 8, 2005), citing <u>Texas v.</u> <u>Cobb</u>, supra at 173.

Here, our analysis is somewhat hindered by the lack of evidence as to the charges, if any, that were formally brought against Roy in Tribal Court. We do know, however, that May arrested Roy for the following three reasons: 1) having a dangerous weapon -- namely, the machete, the handgun, and the .12-gauge shotgun; 2) driving without a license; and 3) making terroristic threats. From the incident that occurred on August 2, 2004, Roy is charged in Federal Court with one Count of Felon in Possession, for the possession of the seven shotgun shells. In addition, May testified, as did Traurig, that the Red Lake Tribal Code does not have a charge comparable to that of being a felon in possession of ammunition, and May further testified that the Red Lake Tribal Code does not provide for any felony charges. Significantly, Roy himself told Traurig that his possession of ammunition had not resulted in charges in Tribal Court.

We find that the charges for which Roy was arrested, which are presumably the same as those that would have been the subject of any formal proceedings in Tribal Court, are distinct from the Count of being a Felon in Possession of ammunition, with which he is charged in Federal Court. See, <u>United States v. Mosby</u>, 101 F.3d 1278,

1282 (8th Cir. 1996)(holding that the defendant's Sixth Amendment rights had not attached as to the Federal violation of being a felon in possession of .44 caliber ammunition, even though he had been previously charged, in State Court, with possession of a starter pistol, and aggravated assault); United States v. Hudson, 267 F. Supp.2d 818 (S.D. Ohio 2003)(holding that the State charge of carrying a concealed weapon differed from the Federal charge of being a felon in possession, and therefore, the defendant's Sixth Amendment right to counsel had not yet attached for the latter offense, even where the weapon underlying each charge was the same); United States v. Libby, 2004 WL 1701042 at *5 (D. Me., July 30, 2004)("As in Cobb, the offenses with which defendant had been charged (assault and criminal threatening) and the federal crime [the officer] was investigating (unlawful gun possession), although factually related, could not be considered the same offense under the Blockburger test."), adopted by, 2004 WL 2203470 (D. Me., September 27, 2004).

Accordingly, we find that the Roy's Sixth Amendment rights, as to the Federal charges, which were the subject of Traurig's interrogation, had not yet attached, and therefore, we recommend that Roy's Motion to Suppress Statements, Admissions, and Answers be denied, in its entirety.

NOW, THEREFORE, It is --

- 42 -

RECOMMENDED:

1.      That the Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 45] be denied.

2.      That the Defendant's Motion to Suppress Statements, Admissions, and Answers [Docket No. 47] be denied.

Dated: June 10, 2005                    s/Raymond L. Erickson
                                        Raymond L. Erickson
                                        UNITED STATES MAGISTRATE JUDGE
                                        **NOTICE**

Pursuant to Rule 45(a), Federal Rules of Criminal Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than June 27, 2005**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete

- 43 -

transcript of that Hearing **by no later than June 27, 2005**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.